JEFFREY GOLDBERG, a Minor, by Michael Goldberg *et al.*, his Parents and Next Friends, *et al.*, Plaintiffs-Appellants, v. STEPHEN B. RUSKIN *et al.*, Defendants-Appellees.

First District (3rd Division)   Nos. 81—1450, 81—1962 cons.

Opinion filed September 12, 1984.—Modified on denial of rehearing December 19, 1984.

RIZZI, P.J., dissenting.

Albert F. Hofeld, Ltd., and William J. Harte, Ltd., both of Chicago, for appellants.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (Patrick D. Halligan, of counsel), for appellees.

JUSTICE WHITE delivered the opinion of the court:

Plaintiffs, Michael Goldberg, Nancy Goldberg, his wife, and Jeffrey Goldberg, their son,[1] instituted this medical malpractice action against

---

[1] The record shows that Jeffrey Goldberg has died, and that this court appointed Michael Goldberg as special administrator of the estate of Jeffrey Goldberg for the purpose of prosecuting this action.

defendants, Stephen B. Ruskin and Strauss Surgical Group, Assoc., S.C. The Goldbergs' amended complaint attempts to set forth two causes of action. The first, a claim for damages based upon "wrongful life," was asserted by Michael and Nancy Goldberg on behalf of Jeffrey. The second, a claim for "wrongful birth" by the parents, sought compensation for injuries suffered by them in their own right.

According to the factual allegations set forth in the amended complaint, Ruskin is a licensed physician and surgeon in the State of Illinois specializing in obstetrics and gynecology, and on or prior to April 6, 1978, he practiced medicine as an employee of Strauss Medical Group. For a period of approximately nine months prior to Jeffrey Goldberg's birth on April 6, 1978, Jeffrey and Nancy Goldberg, his mother, were under the care of defendants. Jeffrey was born with Tay-Sachs disease. Plaintiffs allege that: at all relevant times, defendants had knowledge of Tay-Sachs disease, a devastating and terminal disease affecting infants; defendants knew that the disease has no known treatment and that it afflicts the offspring of Jewish parents at a "higher rate"; defendants knew that a simple testing procedure existed and was in general use within the medical community to determine whether a baby would be born with Tay-Sachs disease; and if the tests had been performed and revealed that Jeffrey would be born with the disease, and Michael and Nancy Goldberg had been informed by defendants of this fact, they would have caused the child to be aborted, which was their unqualified right under the law. Plaintiffs further allege that defendants were guilty of one or more of the following negligent acts or omissions: that they failed to inform Michael and Nancy Goldberg during pregnancy of the risk of Tay-Sachs disease; that they failed to impart to Michael and Nancy Goldberg the knowledge and choice to engage in the simple testing procedure; and that they failed to engage in said testing procedure.[2]

---

[2]Tay-Sachs disease is a fatal, progressive, degenerative disease of the nervous system which occurs primarily in Jewish infants of eastern European ancestry. A diseased child appears normal at birth, but at four to six months of age, the child's central nervous system begins to degenerate, and he suffers eventual blindness, deafness, paralysis, seizures, and mental retardation. His life expectancy is two to four years. Only in the circumstance where both parents are carriers of the Tay-Sachs trait will there be a great likelihood of the presence of the disease in their offspring. The carrier is not affected by the disease, but if both parents are carriers, the probability that their child will have the disease is one in four. There is a blood test to identify carriers of the Tay-Sachs trait. If tests show that both parents are carriers, a further test known as amniocentesis can be performed to determine whether the fetus is afflicted with the disease. See *Naccash v. Burger* (1982), 223 Va. 406, 409-10, 290 S.E.2d 825, 827; *Howard v. Lecher* (1977), 42 N.Y.2d 109, 114, 397 N.Y.S.2d 363, 366, 366 N.E.2d 64, 67 (Cooke, J., dissenting).

Jeffrey Goldberg, through his parents, alleged, as a part of his wrongful life claim, that as a direct and proximate result of the negligent conduct of defendants, he "was born with Tay-Sachs disease and has suffered and will continue to suffer loss of motor function, loss of sensory function, blindness, deafness, pain, disability and numerous other injuries resulting in damages of a personal, permanent and pecuniary nature and finally certain death." He sought damages in an amount in excess of $15,000.

Michael and Nancy Goldberg allege, as a part of their wrongful birth claim, that as a direct and proximate result of defendants' negligence, they have become obligated "to pay large sums of money for doctor and hospital bills and other physical treatment for the care and treatment of Jeffrey," and they "have suffered *** immeasurable emotional distress in the seeing and caring for their child, while he loses motor function, sensory function, sight, hearing, becomes disabled and suffers numerous other injuries resulting in damages of a personal, permanent and pecuniary nature and finally certain death." They also seek damages in an amount in excess of $15,000.

Upon defendants' motion to strike and dismiss the amended complaint, the circuit court entered an order dismissing Jeffrey Goldberg's cause of action for wrongful life. In this order, the circuit court also certified two questions relating to the parents' cause of action for wrongful life as "questions of law as to which there is a substantial ground for difference of opinion" and found that "an immediate appeal of this order may materially advance the ultimate termination of the litigation." These questions are: (1) "Does a cause of action exist in Illinois on behalf of parents for damages in the form of the costs of increased medical, hospital and physical care rendered to a child born with an inherited disease ***?" and (2) "Do the parents *** have a cause of action for their own emotional distress as the result of seeing and caring for their child while his physical condition degenerates into certain death?"

Plaintiffs appeal from the circuit court's judgment dismissing Jeffrey Goldberg's cause of action for wrongful life, and this court allowed defendants' petition for leave to appeal the interlocutory part of the circuit court's order.

At the outset, it is important to emphasize the posture in which this case is now before this court. The question presented for review is not whether plaintiffs should ultimately prevail in this litigation, but rather whether the amended complaint states cognizable causes of action. (See *Becker v. Schwartz* (1978), 46 N.Y.2d 401, 408, 413 N.Y.S.2d 895, 898, 386 N.E.2d 807, 810.) Since our review is limited to

an evaluation of the sufficiency of the amended complaint, we must accept as true all well-pleaded facts. (See *Ostendorf v. International Harvester Co.* (1982), 89 Ill. 2d 273, 280, 433 N.E.2d 253, 256; *Wilczynski v. Goodman* (1979), 73 Ill. App. 3d 51, 54, 391 N.E.2d 479, 482.) Accordingly, we accept as true, without expressing any opinion as to defendants' liability, the allegations that defendants failed to inform Jeffrey's parents of the risk of Tay-Sachs disease and the testing procedure therefor, and that had they been accurately informed, they would have undergone the necessary tests,[3] the results of which would have precipitated a decision on their part to terminate the pregnancy.

■ Before addressing other contentions of the parties concerning the validity of plaintiffs' claims for wrongful life and wrongful birth, we address the defendants' argument that this court should not recognize such causes of action in tort because "the creation of novel torts should be left to the legislature." A similar argument was rejected in *Naccash v. Burger* (1982), 223 Va. 406, 413, 290 S.E.2d 825, 829. The Virginia Supreme Court, in recognizing the existence of a cause of action in favor of parents for the wrongful birth of a child born with Tay-Sachs disease, observed that the determination of the scope of the common law doctrine of negligence is within the province of the judiciary. The court stated:

> "whether a cause of action exists for the wrongs complained of and the damages sought here is a question that should be determined, in our opinion, according to traditional tort principles. Only a novel twist in the medical setting differentiates the present situation from the ordinary malpractice action. Hence, *** we believe we need not defer to the legislature, ***." 223 Va. 406, 413, 290 S.E.2d 825, 829.

We agree with the reasoning of *Naccash*. To the extent that recognition of causes of action for wrongful life or wrongful birth would merely be an extension of existing principles of tort law to new factual situations, we can and should recognize them. (See *Speck v. Finegold* (1981), 497 Pa. 77, 83, 439 A.2d 110, 113; *cf. Cockrum v. Baumgartner* (1983), 95 Ill. 2d 193, 196, 447 N.E.2d 385, *cert. denied* (1983), 464 U.S. 346, 78 L. Ed. 2d 139, 104 S. Ct. 149 (recognizing a limited cause of action for wrongful birth by the parents of a healthy child).) Accordingly, we examine the purported medical malpractice causes of action pleaded in the amended complaint to determine

---

[3]In their amended complaint, plaintiffs did not specifically plead that they would have undergone the tests. Such an allegation, in our opinion, is implicit in the allegations of proximate cause.

whether each sets forth the existence of a duty, a breach of that duty and injury proximately resulting from the breach. See *Cunis v. Brennan* (1974), 56 Ill. 2d 372, 374, 308 N.E.2d 617, 618.

### WRONGFUL LIFE

■ In the purported cause of action for wrongful life, plaintiff Jeffrey Goldberg, through his parents, alleged, in effect, that as a result of the defendants' negligence he was not aborted, but rather was born to experience the pain and suffering attributable to Tay-Sachs disease. He did not allege that any negligence of the defendants caused his disease or that there was anything that the defendants could have done to alter the effects of the disease. See *Dumer v. St. Michael's Hospital* (1975), 69 Wis. 2d 766, 771, 233 N.W.2d 372, 374-75.

The Illinois Appellate Court addressed the issue of wrongful life in *Zepeda v. Zepeda* (1963), 41 Ill. App. 2d 240, 190 N.E.2d 849. In that case, an illegitimate son brought an action in tort against his father for causing him to be born illegitimate. The appellate court affirmed the dismissal of the son's complaint, stating:

> "Recognition of the plaintiff's claim means creation of a new tort: a cause of action for wrongful life. The legal implications of such a tort are vast, the social impact could be staggering. * * *
>
> * * * What does disturb us is the nature of the new action and the related suits which would be encouraged. Encouragement would extend to all others born into the world under conditions they might regard as adverse. One might seek damages for being born of a certain color, another because of race; one for being born with a hereditary disease, another for inheriting unfortunate family characteristics; * * *." (41 Ill. App. 2d 240, 259-60, 190 N.E.2d 849, 858.)

The cause of action asserted on behalf of Jeffrey Goldberg is clearly distinguishable from an action by an illegitimate, but healthy, child. *Zepeda*, therefore, is not dispositive of Jeffrey's wrongful life claim.

Wrongful life actions by unhealthy children like Jeffrey have been received with little favor by courts in this country. Among the courts refusing to recognize an action for wrongful life are the highest courts of New York and Wisconsin. (*Becker v. Schwartz* (1978), 46 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807; *Dumer v. St. Michael's Hospital* (1975), 69 Wis. 2d 766, 233 N.W.2d 372; see also *Berman v. Allen* (1979), 80 N.J. 421, 404 A.2d 8.) The supreme courts of Washington and California, however, have recognized that a child may maintain a limited action for wrongful life to recover the extraordinary expenses necessary to treat his hereditary ailment. (*Harbeson v. Parke-Davis,*

*Inc.* (1983), 98 Wash. 2d 460, 656 P.2d 483; *Turpin v. Sortini* (1982), 31 Cal. 3d 220, 643 P.2d 954, 182 Cal. Rptr. 337.) The latter courts would not permit such a child to recover for pain and suffering or other general damages. *Harbeson v. Parke-Davis, Inc.* (1983), 98 Wash. 2d 460, 482, 656 P.2d 483, 496; *Turpin v. Sortini* (1982), 31 Cal. 3d 220, 234-35, 643 P.2d 954, 963, 182 Cal. Rptr. 337, 346.

There are two major obstacles to a claim by an abnormal child for wrongful life. First, it is impossible to determine whether the child has suffered an injury in being born impaired rather than not being born. (*Turpin v. Sortini* (1982), 31 Cal. 3d 220, 235, 643 P.2d 954, 963, 182 Cal. Rptr. 337, 346.) In other words, it does not appear that the child has suffered any legally cognizable injury. (*Berman v. Allen* (1979), 80 N.J. 421, 428-29, 404 A.2d 8, 12; *Becker v. Schwartz* (1978), 46 N.Y.2d 401, 411, 413 N.Y.S.2d 895, 900, 386 N.E.2d 807, 812.) The injury which Jeffrey allegedly suffered as a result of defendants' alleged negligence is that he was born with Tay-Sachs disease rather than not being born at all. The New York Court of Appeals aptly summarized the dilemma faced by a court when it is confronted with a claim for such damages:

> "Whether it is better never to have been born at all than to have been born with even gross deficiencies is a mystery more properly to be left to the philosophers and the theologians. Surely the law can assert no competence to resolve the issue, particularly in view of the very nearly uniform high value which the law and mankind has placed on human life, rather than its absence. Not only is there to be found no predicate at common law or in statutory enactment for judicial recognition of the birth of a defective child as an injury to the child; the implications of any such proposition are staggering. Would claims be honored, assuming the breach of an identifiable duty, for less than a perfect birth? And by what standard or by whom would perfection be defined?" 46 N.Y.2d 401, 411, 413 N.Y.S.2d 895, 900, 386 N.E.2d 807, 812.

The second obstacle is difficulty in the measure of damages. The primary purpose of tort law is to compensate plaintiffs for the injuries they have suffered wrongfully at the hands of others, and damages for negligence are ordinarily computed by comparing the condition plaintiff would have been in but for the tort with plaintiff's impaired condition as a result of the wrong. (*Berman v. Allen* (1979), 80 N.J. 421, 427, 404 A.2d 8, 11-12.) In a cause of action seeking recovery for wrongful life, the trier of fact would be required "to measure the difference in value between life in an impaired condition and 'the utter void of nonexistence.' " (*Berman v. Allen* (1979), 80 N.J. 421, 427, 404

A.2d 8, 12.) Such a computation is "a task that is beyond mortals, whether judges or jurors." *Harbeson v. Parke-Davis, Inc.* (1983), 98 Wash. 2d 460, 482, 656 P.2d 483, 496.

It is argued on Jeffrey's behalf that difficulty in measuring damages is not a ground for denying recovery. We agree that a court should be reluctant to deny the validity of a cause of action solely because damages are difficult to ascertain. (*Berman v. Allen* (1979), 80 N.J. 421, 428, 386 A.2d 8, 12.) However, the problem in causes of action for wrongful life is not simply the fixing of damages for a conceded injury. (*Turpin v. Sortini* (1982), 31 Cal. 3d 220, 235, 643 P.2d 954, 963, 182 Cal. Rptr. 337, 346.) As already stated, it is impossible to determine whether an infant such as Jeffrey has suffered an injury by being born with an ailment as opposed to not being born at all. In our opinion, these two factors, the apparent absence of any legally cognizable injury and the impossibility of making the comparison required by a compensatory remedy, militate against recognition of an action by an infant such as Jeffrey to recover damages for the pain and suffering he endures as a result of being born with a hereditary ailment.

Accordingly, assuming that defendants owed a duty to Jeffrey *in utero* to inform his parents of the risk of Tay-Sachs disease and the testing procedure for the disease (*cf. Renslow v. Mennonite Hospital* (1977), 67 Ill. 2d 348, 353, 367 N.E.2d 1250, 1253 (holding that viability is no longer a criterion to a common law action for pre-natal injuries)), and that the defendants' breach of that duty was the proximate cause of his birth, Jeffrey nevertheless failed to state a cause of action for wrongful life.

As noted, the supreme court of Washington in *Harbeson* and the supreme court of California in *Turpin* recognized a cause of action by a child for wrongful life to recover the extraordinary expenses necessary to treat his hereditary ailment. These courts assert that it would be "illogical and anomalous" to permit wrongful birth actions by parents to recover the costs of a child's medical care, but to refuse to recognize a similar cause of action by the child. (*Harbeson v. Parke-Davis, Inc.* (1983), 98 Wash. 2d 460, 479, 656 P.2d 483, 495; *Turpin v. Sortini* (1982), 31 Cal. 3d 220, 238, 643 P.2d 954, 965, 182 Cal. Rptr. 337, 348.) They also observe that damages for such extraordinary expenses are both certain and readily measurable. (*Harbeson v. Parke-Davis, Inc.* (1983), 98 Wash. 2d 460, 482, 656 P.2d 483, 496-97; *Turpin v. Sortini* (1982), 31 Cal. 3d 220, 238, 643 P.2d 954, 965, 182 Cal. Rptr. 337, 348.) We, however, need not decide whether to recognize such a limited cause of action for wrongful life. In his cause of action for wrongful life, Jeffrey sought to recover damages for the pain and suffering

caused by his disease. He did not seek to recover the extraordinary expenses to be incurred during his lifetime as a result of his ailment. The absence of any reference to such expenses as injury in the allegations of Jeffrey's claim for wrongful life clearly supports a conclusion that Jeffrey did not seek such damages, especially since his parents, in their claim for wrongful birth, specifically allege that they have been injured in that they have incurred medical expenses on behalf of their child.[4]

### WRONGFUL BIRTH

■ The cause of action by Jeffrey's parents for damages presents different considerations. They allege, in effect, that they were tortiously injured because they were deprived of the option of making a meaningful decision as to whether to abort. (*Berman v. Allen* (1979), 80 N.J. 421, 430-31, 404 A.2d 8, 13.) Like the claim on behalf of Jeffrey for wrongful life, his parents do not allege that any negligence of defendants caused his disease or that there was anything that the defendants could have done to alter the effect of the disease. Several courts have recognized a cause of action for wrongful birth by the parents of a child suffering from birth defects. (*Harbeson v. Parke-Davis, Inc.* (1983), 98 Wash. 2d 460, 656 P.2d 483; *Naccash v. Burger* (1982), 223 Va. 406, 290 S.E.2d 825; *Speck v. Finegold* (1981), 497 Pa. 77, 439 A.2d 110; *Berman v. Allen* (1979), 80 N.J. 421, 404 A.2d 8; *Becker v. Schwartz* (1978), 46 N.Y. 2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807; *Dumer v. St. Michael's Hospital* (1975), 69 Wis. 2d 766, 233 N.W.2d 372; *Jacobs v. Theimer* (Tex. 1975), 519 S.W.2d 846.

The Illinois Supreme Court addressed the question of wrongful birth in *Cockrum v. Baumgartner* (1983), 95 Ill. 2d 193, 447 N.E.2d 385, *cert. denied* (1983), 464 U.S. 846, 78 L. Ed. 2d 139, 104 S. Ct. 149. In *Cockrum*, the supreme court considered two medical malpractice suits. In both cases, the plaintiffs alleged that but for the negligence of the defendants each of the female plaintiffs would not have borne a child. One case alleged that a vasectomy had been negligently

---

[4]In *Turpin*, the California Supreme Court stated that a child and her parents cannot both recover the same expenses, and that where a parent seeks to recover for expenses, a child's separate claim for expenses applies, as a practical matter, only to expenses incurred after the age of majority. (*Turpin v. Sortini* (1982), 31 Cal. 3d 220, 237 n.11, 643 P.2d 954, 965 n.11, 182 Cal. Rptr. 337, 348 n.11; see *Harbeson v. Parke-Davis, Inc.* (1983), 98 Wash. 2d 460, 479-80, 656 P.2d 483, 495.) Since Jeffrey has died, and we recognize that his parents have a claim for expenses incurred as a result of his ailment, as a practical matter, there is no need to recognize a limited cause of action on Jeffrey's behalf for wrongful life.

performed; the other alleged negligence in failing to determine that the female plaintiff was pregnant. The court noted that there was "no indication that the children are other than normal and healthy" (95 Ill. 2d 193, 196, 447 N.E.2d 385, 387), and held that the costs of rearing a normal and healthy child cannot be recovered as damages to the parents (95 Ill. 2d 193, 200, 477 N.E.2d 385, 389). In reaching this conclusion the supreme court recognized the existence of a cause of action for wrongful birth against a physician where it is alleged that because of a doctor's negligence the plaintiff conceived or gave birth, and that in such actions plaintiffs may recover for the pain of childbirth, the time lost in having the child and the medical expenses incurred. (95 Ill. 2d 193, 196, 447 N.E.2d 385, 387.) In refusing to permit recovery of damages for the costs of rearing a normal and healthy child, the court relied on the following reasons: (1) "the speculative nature of the damages"; (2) "concern for the child who will learn that his existence was unwanted and that his parents sued to have the person who made his existence possible provide for his support"; (3) "requiring the payment of rearing costs would impose an unreasonable burden upon a defendant *** because it would permit the plaintiffs to enjoy the benefits of parenthood, while shifting all of the expenses to the defendant [and because] that burden *** is out of proportion to the fault involved"; (4) "allowing such damages would open the door to various false claims and fraud"; and (5) "the birth of a normal healthy child [cannot] be judged to be an injury to the parents." 95 Ill. 2d 193, 198-200, 447 N.E.2d 385, 388.

■ The parents' claim here is distinguishable from the claims in *Cockrum* for wrongful conception and for failure to diagnose a pregnancy. In wrongful conception and wrongful diagnosis cases, "the essence of the wrong for which compensation is sought is the birth of a healthy and normal—albeit, unplanned—child." (*Becker v. Schwartz* (1978), 46 N.Y.2d 401, 410, 413 N.Y.S.2d 895, 899, 386 N.E.2d 807, 811.) Here, the parents' "claims are premised upon the birth of a fully intended but abnormal child for whom extraordinary care and treatment is required." (46 N.Y.2d 401, 410, 413 N.Y.S.2d 895, 899, 386 N.E.2d 807, 811.) The reasons for denying the costs of rearing a normal and healthy child should not prevent the parents of an abnormal child who establish liability from recovering expenses reasonably necessary for the care and treatment of their child's physical impairment. (See *Dumer v. St. Michael's Hospital* (1975), 69 Wis. 2d 766, 775, 233 N.W.2d 372, 376-77; *Jacobs v. Theimer* (Tex. 1975), 519 S.W.2d 846, 849-50.) In reaching this conclusion, we note that the amount of extraordinary expenses for care and treatment are certain and readily

ascertainable. Moreover, if liability is established, requiring the payment of such extraordinary costs would not impose a burden on physicians that is out of proportion with the fault involved.

Mr. and Mrs. Goldberg have alleged the existence of a duty on the part of the defendants to inform them of the risk of Tay-Sachs disease and of the availability of a testing procedure for the disease and that the breach of that duty was the proximate cause of the birth of Jeffrey. Unlike the cause of action brought on behalf of Jeffrey for wrongful life, the parents' cause of action, as we have noted, does allege ascertainable damages: the pecuniary expenses which they have borne for the care and treatment of their infant.[5] (*Becker v. Schwartz* (1978), 46 N.Y.2d 401, 412, 413 N.Y.S.2d 895, 901, 386 N.E.2d 807, 813.) Assuming these factual allegations of the parents' cause of action for wrongful birth to be true, as we must at this stage of the proceedings, "it can be said in traditional tort language that but for the defendants' breach of their duty to advise plaintiffs, the latter would not have been required to assume these obligations." (*Becker v. Schwartz* (1978), 46 N.Y.2d 401, 412-13, 413 N.Y.S.2d 895, 901, 386 N.E.2d 807, 813.) Accordingly, we hold that Mr. and Mrs. Goldberg have stated a cause of action in tort for wrongful birth. This holding is consistent with the holdings of several courts which permit the parents of impaired children to maintain actions for wrongful birth to recover medical and other expenses reasonably necessary for the care and treatment of the impairment. *Harbeson v. Parke-Davis, Inc.* (1983), 98 Wash. 2d 460, 477, 656 P.2d 483, 494; *Naccash v. Burger* (1982), 223 Va. 406, 414, 290 S.E.2d 825, 830; *Schroeder v. Perkel* (1981), 87 N.J. 53, 68-69, 432 A.2d 834, 841-42; *Speck v. Finegold* (1981), 497 Pa. 77, 79, 439 A.2d 110, 111; *Becker v. Schwartz* (1978), 46 N.Y.2d 401, 412-13, 413 N.Y.S.2d 895, 901; 386 N.E.2d 807, 813; *Dumer v. St. Michael's Hospital* (1975), 69 Wis. 2d 766, 776, 233 N.W.2d 372, 377; *Jacobs v. Theimer* (1975), 519 S.W.2d 846, 850.

Defendants argue, however, that a physician has no duty to suggest a eugenic abortion and that the physician-patient relationship does not create an affirmative duty to disclose facts. The only duty that the defendants would impose upon a physician is a duty to honestly answer questions and to give the physical, medical and surgical care he is asked to give. They also argue that nondisclosure of information should not be defined as a breach of duty. We cannot accept these arguments. First, Mr. and Mrs. Goldberg do not allege that a physician has a duty

---

[5]We address the issue of damages for the alleged emotional distress suffered by the parents later in this opinion.

to suggest an abortion. The parents' position is that they had a right to prevent the birth of Jeffrey and that defendants had a duty to disclose the medical information necessary for the exercise of that right. (See *Harbeson v. Parke-Davis, Inc.* (1983), 98 Wash. 2d 460, 472, 656 P.2d 483, 488.) They allege that defendants breached that duty by failure to impart information concerning the risk of Tay-Sachs disease and the availability of a testing procedure, not by failure to suggest an abortion.

■ We also believe that the physician-patient relationship does create an affirmative duty to disclose facts. Such a relationship is based upon the theory that the "physician is learned, skilled and experienced in subjects of vital importance to the patient but about which the patient knows little or nothing." (*Howard v. Lecher* (1977), 42 N.Y.2d 109, 114, 397 N.Y.S.2d 363, 366, 366 N.E.2d 64, 67 (Cooke, J., dissenting); 61 Am. Jur. 2d *Physicians, Surgeons, & Other Healers* secs. 167, 229 (1981).) The nature of this relationship gives rise to a duty of the physician to care for and advise the patient in accordance with proper medical practice. (*Howard v. Lecher* (1977), 42 N.Y.2d 109, 114, 397 N.Y.S.2d 363, 366, 366 N.E.2d 64, 67 (Cooke, J., dissenting).) We conclude that the allegations of Jeffrey's parents sufficiently pleaded the existence of a duty of defendants to disclose facts. Assuming a duty to disclose facts, nondisclosure of those facts would be a breach of that duty. In our opinion, the allegations of a breach of duty are sufficient. In reaching these conclusions we observe that other States have held that the failure to advise parents of the risks of abnormality or of the availability of tests to detect abnormality can be the basis of a cause of action for wrongful birth. *Berman v. Allen* (1979), 80 N.J. 421, 404 A.2d 8; *Becker v. Schwartz* (1978), 46 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807.

■ Defendants also argue that the parents' action, insofar as it seeks damages for costs of extraordinary care for Jeffrey, should be dismissed because it is a derivative claim. They contend that since Jeffrey cannot establish a good cause of action, the parents' cause of action for these costs must also be dismissed. We disagree. The short answer to this argument is that the claim of Mr. and Mrs. Goldberg for their son's medical expenses is based on their own independent claim, not one that is derivative from Jeffrey. In *Schroeder*, the Supreme Court of New Jersey stated: "Parents have a right of their own either to accept or reject a parental relationship, and the deprivation of that right by the negligent misconduct of another creates a cause of action in the parents." (87 N.J. 53, 66, 432 A.2d 834, 840.) Similarly, in *Becker*, the Court of Appeals of New York stated:

"The fact that plaintiffs' wrongful life claims brought on behalf of their infants do not state legally cognizable causes of action inasmuch as they fail to allege ascertainable damages in no way affects the validity of plaintiffs' claims for pecuniary loss. Plaintiffs state causes of action in their own right predicated upon a breach of duty flowing from defendants to themselves, as prospective parents, resulting in damage to plaintiffs for which compensation may be readily fixed. [Citations]." (46 N.Y.2d 401, 413, 413 N.Y.S.2d 895, 901, 386 N.E.2d 807, 813.)

The argument that the parents' claim is derivative from that of the child must be rejected.

In a related argument, defendants contend that Mr. and Mrs. Goldberg's claims for costs of caring for Jeffrey should be denied because they would require that the law of negligence be extended to protect economic interests. They rely on *Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69, 86, 435 N.E.2d 443, 451, and the rule stated therein that purely economic interests are not entitled to protection against mere negligence. The court defined "economic loss" as " 'damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property ***' (citation) as well as 'the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold.' (citation)." (91 Ill. 2d 69, 82, 435 N.E.2d 443, 449.) The extraordinary costs of caring for Jeffrey do not fall within this definition of economic loss, and we decline the defendants' invitation to extend the application of this rule of law to cover actions for wrongful birth.

■ Defendants also argue that Mr. and Mrs. Goldberg do not allege causation adequately. Their first argument in this regard is that the parents failed to plead that facts withheld from them were objectively material. They rely on *Green v. Hussey* (1970), 127 Ill. App. 3d 174, 262 N.E.2d 156, and *Miceikis v. Field* (1976), 37 Ill. App. 3d 763, 347 N.E.2d 320, to support this argument. Initially, we observe that both cases involve the doctrine of informed consent, a doctrine not involved in the instant case, and that neither case states that a plaintiff must plead materiality. Moreover, we believe the question of the materiality of the facts withheld is subsumed within the issue of whether defendants were under a duty to disclose facts, and we have already held that Mr. and Mrs. Goldberg have adequately alleged the existence of a duty flowing from defendants to them. Defendants' second argument is that failure to disclose facts has no legal consequences if eu-

genic abortion is not legally available. Defendants rely on medical authority concerning the testing procedure for Tay-Sachs disease and contend that the testing procedure would not be completed until a time when eugenic abortion may not be legally available in Illinois. The parents contend that there is medical authority suggesting that the testing procedure can be completed at an earlier time. We observe that the parents pleaded the availability of a legal abortion, and we believe that this was sufficient at this stage of the litigation.

Defendants further argue that proximate causation does not appear in the facts alleged by Mr. and Mrs. Goldberg. First, they contend that any consequences of nondisclosure are indirect. They argue: "Though plaintiffs *** allege that they would have undergone tests and would have procured an abortion, the likelihood of such behavior is questionable. *** Parental decision is an intervening cause." Mr. and Mrs. Goldberg allege that if they had been informed that Jeffrey would be born with Tay-Sachs disease, they would have obtained an abortion. At this stage of the pleadings, we must accept this allegation as true. Moreover, to accept defendants' argument, we would have to reject decisions from other States permitting a cause of action for wrongful birth where defendants have negligently failed to inform parents of the availability of tests to detect abnormalities in fetuses, thereby depriving the parents of the option of deciding whether to abort. (See *Berman v. Allen* (1979), 80 N.J. 421, 404 A.2d 8; *Becker v. Schwartz* (1978), 46 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807.) This we are unwilling to do. Secondly, defendants argue that since Tay-Sachs disease is rare, fairness requires that we not recognize a cause of action by Mr. and Mrs. Goldberg for wrongful birth. Assuming that the parents establish the existence of a duty to disclose facts, and that breach of that duty was the cause in fact of the extraordinary expenses they incurred for the care and treatment of Jeffrey's impairment, we can see no reason why defendants should not be held legally responsible for the expenses. See *Harbeson v. Parke-Davis, Inc.* (1983), 98 Wash. 2d 460, 476, 656 P.2d 483, 493.

The remaining issue is whether the parents may recover for the alleged emotional distress they suffered as the result of seeing and caring for their child while his condition degenerated into certain death. Mr. and Mrs. Goldberg allege that their emotional distress was a direct and proximate result of the defendants' negligence; however, they do not allege that they suffered any physical injury or illness that caused or was caused by the emotional distress.

The law in Illinois regarding recovery for negligently caused emotional distress has been altered by our supreme court's decision in

*Rickey v. Chicago Transit Authority* (1983), 98 Ill. 2d 546, 457 N.E.2d 1. Prior to *Rickey*, the "impact rule" governed the question of recovery for emotional distress in Illinois. Under the rule, recovery for negligently caused emotional distress suffered by the direct victim or by a bystander who witnessed the injury of another was denied unless it was accompanied by a contemporaneous physical injury to or impact on the plaintiff. (*Rickey v. Chicago Transit Authority* (1983), 98 Ill. 2d 546, 550, 457 N.E.2d 1, 2; *Braun v. Craven* (1898), 175 Ill. 401, 420, 51 N.E. 657, 664.) In *Rickey*, our supreme court abandoned the impact rule. (98 Ill. 2d 546, 554, 457 N.E.2d 1, 4.) The court also adopted the "zone of physical danger rule," which provides that "a bystander who is in a zone of physical danger and who, because of the defendant's negligence, has reasonable fear for his own safety is given a right of action for physical injury or illness resulting from emotional distress." (98 Ill. 2d 546, 555, 457 N.E.2d 1, 5.) The court stated: "The bystander *** must show physical injury or illness as a result of the emotional distress caused by the defendant's negligence." 98 Ill. 2d 546, 555, 457 N.E.2d 1, 5.

■ While our supreme court in *Rickey* eliminated the requirement of contemporaneous physical injury or impact, it gave no indication that it intended that a plaintiff, whether the direct victim of negligence or a bystander, should be able to recover damages for negligently caused emotional distress where the emotional distress is not accompanied by physical injury or illness. From our reading of the opinion in *Rickey*, we believe that physical injury or illness must be established in order for a plaintiff to recover for negligently caused emotional distress, regardless of whether the plaintiff was the direct victim or a bystander. As noted, Mr. and Mrs. Goldberg do not allege that they suffered any physical injury or illness.

In *Rickey* the court stated: "The standard we adopt here shall be applied to this case and to all cases not finally adjudicated. *** We judge that under the circumstances the plaintiff here should be permitted to plead again. What the facts of the occurrence here were cannot be precisely determined from the complaint, which of course was not drawn with the standard in mind that we announce today." (98 Ill. 2d 546, 556.) As indicated earlier, this case is before us on an interlocutory appeal from orders entered on defendants' motions directed to the legal sufficiency of the amended complaint and has not been finally adjudicated. Like the complaint in *Rickey*, the amended complaint here was not drawn with the *Rickey* standard in mind, and plaintiffs should be allowed to replead.

CONCLUSION

In summation, we hold that: (1) Michael and Nancy Goldberg failed to state a cause of action on behalf of Jeffrey for wrongful life; (2) they, as parents, stated a cause of action for the wrongful birth of Jeffrey for the recovery of expenses reasonably necessary for the care and treatment of Jeffrey's physical impairment; and (3) they should be given an opportunity to plead facts which would entitle them to recover damages for emotional distress under the standards set forth in *Rickey v. Chicago Transit Authority* (1983), 98 Ill. 2d 546, 457 N.E.2d 1. For the aforementioned reasons, the judgment of the circuit court of Cook County in favor of defendants on count I of the amended complaint is affirmed, and the cause is remanded for further proceedings consistent with this opinion.

Affirmed and remanded.

O'CONNOR, J., concurs.

RIZZI, P.J., dissenting:

I disagree with the majority's analysis of the issues presented in this case and I disagree with the majority's conclusion as to count I of the amended complaint. I also disagree with the majority's treatment of certified question 2. I would reverse the dismissal and judgment entered in favor of defendants on count I. I would also reverse the order striking paragraph 11 of count II and give plaintiffs leave to plead paragraph 11 again to take into account the answer to certified question 2 as shall be stated herein. 1 believe this case should be remanded for further proceedings consistent with this opinion.

As to count I, the majority's analysis and conclusion are untenable for several reasons. First, the majority wrongfully assumes that count I is a claim for the wrongful life of Jeffrey Goldberg. In fact, plaintiff is not seeking to recover for wrongful life and, contrary to the majority's analysis, plaintiff does not endow his cause of action with great social issues involving wrongful life. Rather, as he is entitled under our existing law, plaintiff is merely seeking redress for pain and suffering caused by defendants' negligence.[7]

The error made by the majority comes to the fore by a simple examination of the amended complaint. Count I does not allege a recov-

---

[7]Specifically, count I states that Jeffrey Goldberg suffered "loss of motor function, loss of sensory function, blindness, deafness, pain, disability and numerous other injuries" resulting from defendants' negligence.

ery for wrongful life, and the term "wrongful life" does not appear anywhere in the amended complaint. Count I is merely a survival action (Ill. Rev. Stat. 1983, ch. 110½, par. 27—6) to recover for pain and suffering caused by defendants' negligence. As such, it should be treated like any other survival action, *i.e.*, the tortfeasors should be made to compensate the decedent's estate for the pain and suffering endured by the decedent. Plainly, the majority is wrong in pasting a wrongful life label on plaintiff's claim and then contending that it fails because a party cannot recover for a wrongful life claim. Since plaintiff is not seeking damages for wrongful life, the majority's contention is simply argument by epithet rather than logic or reason.

Next, the majority's conclusion that Jeffrey Goldberg did not suffer any injury as a result of defendants' negligence is plainly untenable. On this point, the majority totally ignores reality and adopts instead an ontological precept that a child is better off enduring real pain and suffering than the child would have been had the child not been born at all. In reaching its conclusion, the majority overlooks the fact that judges must deal with reality and not metaphysical concepts. Metaphysics is a subject that is best left to the theologians and the philosophers and others similarly inclined. Here, the sober reality with which we, as judges, must come to grips is that Jeffrey Goldberg endured immense pain and suffering that he would not have had to endure had defendants not been negligent. To hold that he was not injured as a result of defendants' negligence not only shunts reality but also imposes a cruel hoax upon the people involved in these tragic circumstances. I find the majority's conclusion indefensible.

The majority also wrongfully concludes that count I should be barred because of the "difficulty in the measure of damages." In count I, plaintiff is seeking damages solely for pain and suffering, which are traditional elements of damages in a tort case. Thus, the only uncertainty here is the amount of damages and not whether damages resulted at all.

It would be a travesty of justice to deny any recovery to an injured party solely because the tort is of a nature that the amount of damages cannot be determined with exactitude. To deny any recovery for that reason would relieve the tortfeasor from having to make redress for his wrongful conduct at the expense of the injured party. Thus, in such cases it is sufficient for recovery if the evidence shows the extent of the damages by reasonable inference, albeit not with absolute certainty. The tortfeasor has no justifiable complaint with such a prescript since the risk of uncertainty should be rightfully borne by the person who causes the suffering, rather than the person who endures the suffering.

Difficulty in the ascertainment of the exact amount of damages should not preclude recovery.

To support its position, the majority states: "The primary purpose of tort law is to compensate plaintiffs for the injuries they have suffered wrongfully at the hands of others, and damages for negligence are ordinarily computed by comparing the condition plaintiff would have been in but for the tort with plaintiff's impaired condition as a result of the wrong. *** In a cause of action seeking recovery for wrongful life, the trier of fact would be required 'to measure the difference in value between life in an impaired condition and "the utter void of nonexistence." ' " The majority also states: "Such a computation is 'a task that is beyond mortals, whether judges or jurors.' " Here again, the majority simply fails to appreciate that count I is not "a cause of action seeking recovery for wrongful life." In count I, plaintiff is merely seeking to recover damages for pain and suffering. As in any other negligence case, the trier of fact would only be required to compare pain and suffering versus no pain and suffering to measure the amount of damages. Plainly, the task of the trier of fact would be no more difficult in this instance than it would be in any other negligence case. Certainly, the trier of fact would have a less difficult task in measuring damages in the present case than the trier of fact had in *Jones v. Karraker* (1983), 98 Ill. 2d 487, 457 N.E.2d 23, where the court affirmed a verdict in favor of the plaintiff in a wrongful death action in which the decedent died *en ventre sa mere.*

In its opinion, the majority analyzes many cases which discuss the creation of a new cause of action for wrongful life. Plainly, these cases are not analogous to the present case, because here plaintiff is suing to recover solely for pain and suffering resulting from a negligent breach of duty, and the existence of the duty to the child is conceded by the majority. Recognition of plaintiff's claim here does not mean the creation of a new tort or a cause of action for wrongful life. In addition, all of the cases relied upon by the majority involve attempts to recover for "wrongful life," a term which does not even appear in the amended complaint here. Moreover, the cases relied upon by the majority are from other jurisdictions. I do not believe that Illinois needs to walk in the shadow of other jurisdictions, but rather, I believe that Illinois should adumbrate the path of American jurisprudence. Thus, I am neither persuaded nor governed by the cases relied upon by the majority.

The only other matter relating to count I that needs to be discussed involves the sufficiency of the factual allegations to establish a duty on the part of defendants. Here, I agree with the majority that the factual allegations in the amended complaint sufficiently allege the existence

of a duty on the part of defendants to have informed Nancy and Michael Goldberg of the risk of Tay-Sachs and the availability of testing procedures for the disease.[8] In my opinion, this duty that was owed by defendants to Nancy and Michael Goldberg logically extended to Jeffrey Goldberg. (*Cf. Renslow v. Mennonite Hospital* (1977), 67 Ill. 2d 348, 367 N.E.2d 1250.) This latter point is conceded by the majority.

For the reasons stated, I do not agree with the majority that count I fails to state a cause of action. I believe that the trial court erred in dismissing count I and entering judgment in favor of defendants on that count.

I next address the interlocutory appeal from the order striking paragraph 11 of count II.[9] Since the interlocutory appeal is being taken pursuant to Supreme Court Rule 308, the only matters that are before us are the two questions certified by the trial court and how the answers to the two questions affect the striking of paragraph 11. (See *Getto v. City of Chicago* (1981), 92 Ill. App. 3d 1045, 1048, 416 N.E.2d 1110, 1112-13; Ill. Ann. Stat., ch. 110A, par. 308, Committee Comments, at 452, Supp. to Historical and Practice Notes, at 453 (Smith-Hurd 1969-1983 Supp.).) The two questions that were certified are stated as follows:

"(1) Does a cause of action exist in Illinois on behalf of parents for damages in the form of the costs of increased medical, hospital and physical care rendered to a child born with an inherited disease when the parents have also alleged that: defendant is an obstetrician who attended the mother; defendant knew or should have known the parents were possible carriers of the inheritable trait; tests exist to screen parents for the trait and other tests exist to test unborn infants for the disease; minimally competent obstetricians in practice disclose risks of the disease and disclose existence of the tests and perform the tests; the defendant did not disclose the risk of disease and did not disclose the tests and did not do the tests; had defendant disclosed the risks and tests,

---

[8]When genetic defects are suspected by a physician, testing procedures that may be considered include amniocentesis and the more recently developed chorionic villi sampling. See Van, *New test checks for birth defects*, Chicago Tribune, Oct. 13, 1983, Tempo, at 1.

[9]Paragraph 11 of count II states: "As a direct and proximate result of the aforesaid careless and negligent conduct of the defendants, and each of them, plaintiffs, Michael and Nancy Goldberg, have suffered and will continue to suffer immeasurable emotional distress in the seeing and caring for their child, while he loses motor function, sensory function, sight, hearing, becomes disabled and suffers numerous other injuries resulting in damages of a personal, permanent and pecuniary nature and finally certain death."

the parents would have ordered them; the tests would have shown that the fetus was diseased; the mother would have aborted the fetus; by virtue of abortion the parents would have avoided the costs alleged as damages.

(2) Do the parents under the same allegation have a cause of action for their own emotional distress incurred as the result of seeing and caring for their child while his physical condition degenerates into certain death."

I agree with the majority that the answer to question 1 is in the affirmative. I wish to add, however, that for minor children the cause of action that is described in question 1 rightfully belongs to the parents and not to the child. (See *Kennedy v. Kiss* (1980), 89 Ill. App. 3d 890, 894-95, 412 N.E.2d 624, 628.) Thus, the fact that Jeffrey Goldberg died on March 10, 1981, does not affect the parents' cause of action.

The gist of question 2 is whether a plaintiff may recover for emotional distress caused by a defendant's negligence. In answering this question, it is important to note that the trial court entered its order and certified the question on June 11, 1981. In 1983, the supreme court decided *Rickey v. Chicago Transit Authority* (1983), 98 Ill. 2d 546, 457 N.E.2d 1. In *Rickey*, the supreme court expounded on the issue presented here and held that a plaintiff may recover for emotional distress caused by a defendant's negligence if the plaintiff shows "physical injury or illness as a result of the emotional distress caused by the defendant's negligence."[10] (98 Ill. 2d 546, 555, 457 N.E.2d 1, 5.) Thus, I believe that the answer to the second question is in the affirmative if the parents show physical injury or illness as a result of the emotional distress caused by defendants' negligence.[11]

---

[10]Under *Rickey*, if the plaintiff was a bystander at an accident in which another person was physically injured, then in order for the plaintiff to recover for his own emotional distress, he must also "have been in such proximity to the accident in which the direct victim was physically injured that there was a high risk to him of physical impact." (98 Ill. 2d 546, 555, 457 N.E.2d 1, 5.) In the present case, this principle is not applicable since plaintiffs in count II, Michael and Nancy Goldberg, are not attempting to recover as bystanders to an accident. Here, the negligence alleged in count II is defendants' "failure to inform" plaintiffs. This negligence flows directly from defendants to plaintiffs. Thus, if plaintiffs are able to show physical injury or illness as well as emotional distress resulting from defendants' negligence, they should be able to recover for both elements of damages just as they would in any other negligence case where the negligence is direct.

[11]I do not consider this conditional requirement to recover for emotional distress an undue burden since medicine has now advanced to the stage where there is substantial evidence available to establish that emotional distress and physical injury or illness are generally matters in consort. See, for example: Effects of distress on the heart (Crisp & Queenan, *Myocardial Infarction and the Emotional Climate*, 1(8377) The Lancet 616

In addition, in *Rickey*, the court stated: "The standard we adopt here shall be applied to this case and to all cases not finally adjudicated. [Citation.] We judge that under the circumstances the plaintiff here should be permitted to plead again." (98 Ill. 2d 546, 556, 457 N.E.2d 1, 5.) Here, since the standard adopted by the supreme court in *Rickey* is applicable, but the trial court entered its order and struck paragraph 11 before *Rickey* was decided, I believe that plaintiffs should be permitted to plead paragraph 11 again to take into account the answer to certified question 2. Substantial justice demands that plaintiffs be given this opportunity.

Accordingly, I would reverse the dismissal and judgment entered in favor of defendants on count I of the amended complaint. I would also answer the two questions that were certified by the trial court as I have stated herein. In addition, I would reverse the order striking paragraph 11 of count II and permit plaintiffs to plead paragraph 11 again to take into account the answer to certified question 2. I believe this case should be remanded for further proceedings consistent with this opinion.

### ADDENDUM

This dissent was filed before the majority opinion was modified to its present form. The modification in the majority opinion relates to the majority's treatment of and conclusion as to certified question 2.

---

(March 17, 1984)); abnormalities in immune function caused by emotional distress (Riscalla, *The Influence of Psychological Factors on the Immune System*, 9(3) Medical Hypotheses 331 (September 1982)); relationship between severe emotional distress and ulcers (Peters & Richardson, *Stressful Life Events, Acid, Hypersecretion, and Ulcer Disease* 84(1) Gastroenterology 114 (1983)); psychological stress and certain muscle pain and illness (Moody, Kemper, Okeson, Calhoun & Packer, *Recent Life Changes and Myofascial Pain Syndrome*, 48(3) Journal of Prosthetic Dentistry 328 (September 1982)); emotional stress and multiple sclerosis (Warren, Greenhill & Warren, *Emotional Stress and The Development of Multiple Sclerosis: Case-control Evidence of a Relationship*, 35 Journal of Chronic Diseases 821 (1982)); biological responses to stress (Bridges, *The Physiology and Biochemistry of Stress: Some Practical Aspects*, 226 The Practitioner 1575 (September 1982)); the effects of stress upon the nervous system (Trimble & Wilson-Barnett, *Neuropsychiatric Aspects of Stress*, 226 The Practitioner 1580 (September 1982)).